## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MASSOUD SAGHIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-15-00701-PRW |
| | ) | |
| AVRAHAM SHEMUELIAN; E&E CAPITAL, | ) | |
| INC.; and STRYKER BUILDING, L.L.C, f/k/a | ) | |
| LAWYER'S TITLE BUILDING, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Massoud Saghian, filed a Motion for Summary Judgment (Dkt. 112) on November 29, 2018, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Defendants Avraham Shemuelian, E&E Capital, Inc., and Stryker Building, L.L.C. jointly filed a Response (Dkt. 117) on December 20, 2018. Plaintiff's Reply (Dkt. 118) was filed December 27, 2018. Upon review of the parties' filings, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (Dkt. 112) as set forth more fully below.

### *Burden of Proof*

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines

only whether there is a genuine dispute for trial before the fact-finder.[1] The movant bears the initial burden of demonstrating the absence of a genuine, material dispute and an entitlement to judgment.[2] A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim.[3] A dispute is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[4]

If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing . . . that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact."[5] The nonmovant does not meet its burden by "simply show[ing] there is some metaphysical doubt as to the material facts,"[6] or by

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[3] *Anderson*, 477 U.S. at 248; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[4] *Anderson*, 477 U.S. at 248; *Adler*, 144 F.3d at 670.

[5] Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006).

[6] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995)).

theorizing a "plausible scenario" in support of its claims.[7] "Rather, 'the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[8] If there is a genuine dispute as to some material fact, the district court must consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.[9]

## *Factual Background*

This case arises out of a business deal between family members. Back in 2006, Defendant Avraham Shemuelian (hereinafter "Avi") had identified several parcels of real property in Oklahoma City that he wished to acquire. One property was the old Baptist General Convention of Oklahoma Building located at 1141 N. Robinson Avenue, which because of some of its more recent tenants has also been called either The Lawyer's Title Building or The Stryker Building.[10] Another property was the old First Church of Christ – Scientist Building located at 1200 N. Robinson Avenue.[11] Avi needed to raise

---

[7] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[8] *Neustrom*, 156 F.3d at 1066 (quoting *Anderson*, 477 U.S. at 251–52; *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)).

[9] *Scott*, 550 U.S. at 380; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

[10] Pl.'s Mot. Summ. J. (Dkt. 112) at 5. This fact is not material to the motion at hand, but it helps to understand the full context.

For the sake of clarity, the Court cites pleadings and exhibits according to the CM/ECF page numbers appearing at the top of the page next to the file-stamp, rather than according to the page number at the bottom of the page.

[11] *Id.* This fact is not material to the motion at hand, but it helps to understand the full context.

capital for a down-payment on these buildings and to conduct renovations. So Avi approached his aunt in California, Parvaneh Saghian (hereinafter "Parvaneh"), and his uncle in Israel, Plaintiff Massoud Saghian (hereinafter "Nissan"), about an investment opportunity.[12]

Sometime in August or early September of 2006, Avi, Parvaneh, and Nissan entered into an oral agreement.[13] Per the terms of that oral agreement, the parties would form a new company, Lawyers Title Building, L.L.C. (hereinafter "LTB"), to purchase and manage the real property. Nissan would invest an initial amount of $215,000 in exchange for a 25% share of the LTB's membership units.[14] Parvaneh would also invest $215,000 for her own 25% share, and Avi would donate his time to manage LTB's business affairs free of compensation in exchange for the remaining 50% share.[15] There was only one problem for Nissan: as an Israeli citizen who lives in Israel, he is prevented from acquiring title to or owning land in Oklahoma by virtue of article XXII, section 1 of the Oklahoma Constitution.[16] So the parties orally agreed that Nissan's 25% share would be held

---

[12] *Id.* This fact is not material to the motion at hand, but it helps to understand the full context.

[13] Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 1); Defs.' Resp. (Dkt. 117) at 7 (stating that Plaintiff's Fact No. 1 is "[u]ndisputed but irrelevant").

[14] Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 1 and Fact No. 2); Defs.' Resp. (Dkt. 117) at 7 (not disputing either fact).

[15] Pl.'s Mot. Summ. J. (Dkt. 112) at 9–10. These facts are not material to the motion at hand, but they help to understand the full context.

[16] *See* Defs.' Resp. (Dkt. 117) at 6; *see also* Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 2) (stating that Nissan's 25% share would be held nominally by Avid "because Nissan did not live in the United States"). *See generally* Okla. Const. art. XXII, § 1 ("No alien or person who is not a citizen of the United States, shall acquire title to or

nominally by Avi.[17] Nissan's 25% share would entitle him to 25% of LTB's net profits or, in the event LTB sold the real property, to 25% of the net sales proceeds.[18]

Soon after the oral agreement was made, Avi brought his long-time business partner, Dan Weingarten, into the joint venture to assist in management of LTB in exchange for half of Avi's 50%-share (i.e., a 25% share of LTB's membership units).[19] LTB was formed under the laws of the State of Oklahoma on August 15, 2006.[20] Although the document contains the typewritten date of August 15, 2006, it appears the parties executed the Operating Agreement for LTB on September 18, 2006.[21] The Operating Agreement states that Avi's company, Defendant E&E Capital Inc., owns half of LTB's membership units; that Parvaneh's company, Magic Investments, L.L.C., owns a quarter of LTB's

---

own land in this state, and the Legislature shall enact laws whereby all persons not citizens of the United States, and their heirs, who may hereafter acquire real estate in this state by devise, descent, or otherwise, shall dispose of the same within five years upon condition of escheat or forfeiture to the State: Provided, This shall not apply to Indians born within the United States, nor to aliens or persons not citizens of the United States who may become bona fide residents of this State: And Provided Further, That this section shall not apply to lands now owned by aliens in this State.").

[17] Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 2); Defs.' Resp. (Dkt. 117) at 7 (stating that Plaintiff's Fact No. 2 is "[u]ndisputed").

[18] Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 2); Defs.' Resp. (Dkt. 117) at 7 (stating that Plaintiff's Fact No. 2 is "[u]ndisputed").

[19] Pl.'s Mot. Summ. J. (Dkt. 112) at 6. This fact is not material to the motion at hand, but it helps to understand the full context.

[20] Compl. (Dkt. 1) ¶ 5, at 2; Am. Answer & Counterclaims of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 21) ¶ 5, at 1 ("admit[ting] the allegations in paragraph 6 of Plaintiff's Complaint"). On January 28, 2014, LTB changed its name to Stryker Building, L.L.C. Compl. (Dkt. 1) ¶ 6, at 2; Am. Answer & Counterclaims of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 21) ¶ 6, at 2 ("admit[ting] the allegations in paragraph 6 of Plaintiff's Complaint").

[21] *See* Operating Agreement of LTB (Dkt. 92-1) at 2, 14–19.

membership units; and that Mr. Weingarten's company, D & Z BH, Inc., holds the remaining quarter of LTB's membership units.[22] The Operating Agreement does not acknowledge Nissan's involvement at all, which demonstrates the significance of the behind-the-scenes oral agreement between Avi and Nissan.

After the initial capital contribution, Avi asked both Parvaneh and Nissan for additional contributions. The parties seemingly dispute the amount of the additional contributions, with Nissan asserting that he contributed an additional $160,000 that would bring his overall contribution up to $375,000 and with Avi asserting that Nissan loaned him only $302,255.[23] As will be discussed later, however, it does not appear this factual dispute is genuine, entitling the Court to proceed on the assumption that the parties do not dispute that Nissan's overall contribution was $375,000.[24]

Something transpired thereafter that prompted Nissan and Avi to meet in Oklahoma City and to reduce their oral agreement to writing with some modifications.[25] On or about June 17, 2010, Nissan and Avi met with Skip Cunningham, an attorney Avi had previously

---

[22] *See* Operating Agreement of LTB (Dkt. 112-9) at 12.

[23] *Compare* Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 3), *and id.* at 13 (Undisputed Facts Nos. 6 and 7, which mention the total contribution amount of $375,000), *with* Defs.' Resp. (Dkt. 117) at 8, 10–11 (Response to Plaintiff's Fact No. 7 and Defendants' Undisputed Fact No. 1), *and id.* at 7 (Response to Plaintiff's Facts Nos. 3 and 6).

[24] *See infra* notes 72–79 and accompanying text.

[25] It is not relevant or material what caused that decision, but Nissan claims the cause was "a dispute [that] arose as to the accuracy of the distributions" given to Parvaneh and Nissan. Pl.'s Mot. Summ. J. (Dkt. 112) at 6–7.

hired on behalf of LTB.[26] They asked Mr. Cunningham to prepare documents evidencing the oral agreement with some modified terms.[27] After waiving any potential conflict of interest that would arise from having Mr. Cunningham represent both of them, Nissan and Avi executed a Loan Agreement (Dkt. 1-3), a Convertible Promissory Note Due on Demand (Dkt. 1-2), and a Security Agreement (Dkt. 1-4) all drafted by Mr. Cunningham.[28]

The nine-page Loan Agreement (Dkt. 1-3) appears to memorialize the bulk of the agreement between Nissan and Avi, as it discusses the creation of a Convertible Promissory Note and the execution of a Security Agreement.[29] Moreover, its "Miscellaneous" provisions state that it is an integrated agreement that overrides the terms of the oral agreement:

> 9.4  **Integrated Agreement.**  This Loan Agreement, all of the Loan Documents executed pursuant hereto or in connection herewith constitute the entire agreement between the parties hereto, and supercede [sic] and replace all prior negotiations and written and oral agreements between the Borrower, the Company, and the Lender or any party on their behalf, and there are no agreements, understandings, warranties or representations between the parties

---

[26] Pl.'s Mot. Summ. J. (Dkt. 112) at 13 (Undisputed Facts Nos. 4 and 5); Defs.' Resp. (Dkt. 117) at 7 (not disputing those facts).

[27] Pl.'s Mot. Summ. J. (Dkt. 112) at 13 (Undisputed Fact No. 6); Defs.' Resp. (Dkt. 117) at 7 (only disputing whether Nissan delivered $375,000 to Avi but not otherwise disputing the purpose for visiting Mr. Cunningham); *see also* Letter from Clell I Cunningham, III, Dunn Swan & Cunningham, to Avraham She[m]uelian, E & E Capital, Inc. et al. (Dkt. 112-2) at 1 (June 17, 2010) (defining the "Scope of Representation" as "provid[ing] assistance to you in preparing commercial loan documentation to evidence the loan from Massoud Saghian to Avraham She[m]uelian").

[28] Pl.'s Mot. Summ. J. (Dkt. 112) at 13–14 (Undisputed Facts Nos. 7 and 8); Defs.' Resp. (Dkt. 117) at 8 (not disputing Plaintiff's Fact No. 8 and, with respect to Plaintiff's Fact No. 7, only disputing Nissan's delivery of $375,000, as previously discussed).

[29] Loan Agreement (Dkt. 112-4) §§ 2.1, 4.1, at 1–2.

regarding the interim financing of the Project other than those set forth in such documents.[30]

Section 1 of the Loan Agreement concerns the loan:

> 1.1   **Loan.** Lender agrees to lend the Borrower, and the Borrower agrees to borrow from Lender the sum of THREE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($375,000.00), without interest thereon, for the purpose of financing the purchase and operation by the Company of the real property described at Exhibit "a" hereto . . . . The unpaid principal balance of funds advanced under the Convertible Promissory Note (as hereafter defined will be due and payable on demand *in accordance with the terms and conditions hereof* (the "Loan Maturity Date").[31]

Section 2 of the Loan Agreement concerns the separate Convertible Promissory Note that

the parties would be executing:

> 2.1   **Convertible Promissory Note.**    The Convertible Promissory Note shall be evidenced by a Convertible Promissory Note of even date herewith in the principal face amount of THREE HUNDRED THOUSAND SEVENTY FIVE THOUSAND DOLLARS ($375,000.00), in form and substance and payable on terms approved by the Lender (the "Convertible Promissory Note"). The Convertible Promissory Note shall be non-interest bearing. The entire unpaid principal balance shall be due and payable on the Loan Maturity Date *by conversion into Units of the Company as provided therein*. . . .

> 2.2   **Convertible Promissory Note Payment.**    The Convertible Promissory Note shall be a Convertible Promissory Note *providing for the conversion of the Note, in full upon demand, into such number of Units of the Company such that after the conversion, Lender shall*

---

[30] *Id.* § 9.4, at 5; Pl.'s Mot. Summ. J. (Dkt. 112) at 14 (Undisputed Fact No. 9); Defs.' Resp. (Dkt. 117) at 8 (stating in response to Plaintiff's Fact No. 9 that "[t]he documents speak for themselves").

[31] Loan Agreement (Dkt. 112-4) § 1.1, at 1 (emphasis added).

> *be the owner and holder of fifty percent (50%) of the outstanding Units of the Company.*[32]

Section 4 of the Loan Agreement concerns the collateral for the loan and the separate Security Agreement the parties would be executing:

> 4. **COLLATERAL SECURITY.** The performance of all covenants and agreements contained in this Loan Agreement and in the other documents executed or delivered as a part of this transaction and the payment of the Note . . . shall be secured by the following:
>
> > 4.1 **Security Agreement.** Borrower shall execute and deliver to Lender a Security Agreement granting a first priority security interest covering all of Borrower's Units of ownership in the Company, whether now owned or hereafter acquired, and all proceeds, products, profits, income, additions to, replacements and accessions thereof (the "Collateral").[33]

In Section 5 of the Loan Agreement, Avi and LTB made several representations and warranties, including a warranty that Avi, as "Borrower[,] has full authority, power and legal right to enter into and carry out the provisions of this Loan Agreement and other documents contemplated herein and to consummate the transactions contemplated hereby."[34] Section 6 contained several covenants made by Avi and LTB, including a covenant to perform all obligations under the Loan Agreement, to furnish Nissan all requested information concerning the purchase and renovation of the buildings or the

---

[32] *Id.* §§ 2.1–2.2, at 1 (emphasis added); Pl.'s Mot. Summ. J. (Dkt. 112) at 15 (Undisputed Fact No. 16); Defs.' Resp. (Dkt. 117) at 8 (stating in response to Plaintiff's Fact No. 16 that "[t]he document speaks for itself").

[33] Loan Agreement (Dkt. 112-4) §§ 4–4.1, at 2; Pl.'s Mot. Summ. J. (Dkt. 112) at 15 (Undisputed Fact No. 17); Defs.' Resp. (Dkt. 117) at 8 (taking issue with Plaintiff's characterization of his membership units in LTB as "additional" collateral, but stating that such units were "the collateral for a loan").

[34] Loan Agreement (Dkt. 112-4) § 5.1, at 2.

financial status of LTB, to only use the loaned funds for the purposes set forth in Section 1, and to maintain accurate books and records of accounts.[35] Section 7 defined what acts would constitute default under the loan documents, including nonpayment of the note, breach of the covenants in Section 6 of the Loan Agreement or in any of the other loan documents, a change in ownership of LTB or of the buildings it purchased, or the institution of bankruptcy or receivership proceedings by or against Avi or LTB.[36] Section 8 defined the remedies in the event of default as follows:

> 8.1 **Acceleration of Note.**      Declare the Convertible Promissory Note . . . to be immediately due and payable whereupon the Note . . . shall become forthwith due and payable without presentment, demand, protest or notice of any kind, and the Lender shall be entitled to proceed simultaneously or selectively and successively to enforce its [sic] rights under the Convertible Promissory Note, this Loan Agreement, and any of the instruments executed pursuant to the terms hereof, or in connection herewith to evidence or secure the obligations of the Borrower . . . and to exercise all other rights available to the Lender at law or in equity.[37]

Section 9 included miscellaneous contractual provisions.[38] The Loan Agreement was executed by Avi, in his individual capacity and as manager of LTB, and by Nissan.[39]

---

[35] *See id.* §§ 6.1–6.4, at 3–4.

[36] *See id.* §§ 7–7.7, at 4; Pl.'s Mot. Summ. J. (Dkt. 112) at 17 (Undisputed Facts Nos. 23, 24, and 25); Defs.' Resp. (Dkt. 117) at 9 (stating in response to Plaintiff's Facts Nos. 23, 24, and 25 that "[t]he document speaks for itself").

[37] *See* Loan Agreement (Dkt. 112-4) §§ 8–8.1, at 4–5.

[38] *See id.* §§ 9–9.7, at 5–6.

[39] *Id.* at 6.

The three-page Convertible Promissory Note executed in conjunction with the Loan Agreement memorializes the debt owed and sets forth the conditions for converting the outstanding debt into membership units in LTB:

> **SECTION 1.  General.**  For value received, Avraham She[m]uelian, an individual, and E & E Capital, Inc., a California corporation (collectively, the "Borrowers"), hereby promise to pay to the order of Massoud Saghian, an individual . . . (the "Lender") or his assigns, at such place as may be designated in writing by the Lender, the principal sum of THREE HUNDRED THOUSAND SEVENTY FIVE THOUSAND DOLLARS ($375,000.00), without interest thereon, thirty (30) days after demand therefore (the "Maturity Date"), *payable, in full, as follows.*

> **SECTION 2.  Payment Upon Demand.**  *Upon demand, Borrowers shall* take such steps as may be necessary to *cause this Note to be converted into such  number of Units of Lawyers Title Building, L.L.C.*, an Oklahoma limited liability company, (the "Company") *such that after the conversion, the Lender shall be the owner and holder of fifty percent (50%) of the outstanding Units of the Company*. This Note shall otherwise be non-recourse as to any cash sums due hereunder.[40]

Section 10 reinforces the notion that the Note must be repaid with membership Units only:

> **SECTION 10.  Conversion into Equity Interest.**  It is the intention of the parties hereunder that this Note may *only* be repaid *by conversion of the indebtedness due hereunder to fifty percent (50%) of the then total outstanding Units of Company.*[41]

---

[40] Convertible Promissory Note (Dkt. 112-3) §§ 1–2, at 1 (emphasis added); Pl.'s Mot. Summ. J. (Dkt. 112) at 15 (Undisputed Facts Nos. 13, 14, and 15); Defs.' Resp. (Dkt. 117) at 8 (stating in response to Plaintiff's Fact No. 13 that the face amount stated on the Note is undisputed, that Plaintiff's Fact No. 14 is "[u]ndisputed," and that "[t]he document speaks for itself" in response to Plaintiff's Fact No. 15).

[41] Convertible Promissory Note (Dkt. 112-3) § 10, at 3 (emphasis added); Pl.'s Mot. Summ. J. (Dkt. 112) at 15 (Undisputed Fact No. 15); Defs.' Resp. (Dkt. 117) at 8 (stating in response to Plaintiff's Fact No. 15 that "[t]he document speaks for itself," but arguing that such "language was intended as a 'pledge'").

Section 3 defined what acts would constitute default under the Convertible Promissory Note in terms identical to Section 7 of the Loan Agreement,[42] and defined the remedies on default as follows:

> 3.2 <u>Remedies on Default</u>. In case any one or more Events of Default shall occur and be continuing and acceleration of this Note or any other indebtedness of the Borrowers to the Lender shall have occurred, the Lender may, *inter alia*, proceed to protect and enforce his rights by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained in this Note, or for an injunction against a violation of any of the terms hereof or thereof or in and of the exercise of any power granted hereby or thereby by law. No right conferred upon the Lender by this Note shall be exclusive of any other right referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. [43]

Section 4 lists the defenses to which Avi's obligations are not subject, including "reduction, limitation, impairment, termination, defense, set-off, counterclaim or recoupment for any reason."[44] Section 5 concerned replacement of the note in the event of its loss, theft, destruction, or mutilation.[45] Section 6 granted Nissan the right to recover costs and attorney fees from Avi in the event the indebtedness gets collected in bankruptcy, receivership, or other court proceedings.[46] The remaining section contained miscellaneous contractual provisions such as what constituted waiver, how the Note could be amended, and the choice

---

[42] *See* Convertible Promissory Note (Dkt. 112-3) §§ 3–3.1.7, at 1–2; Pl.'s Mot. Summ. J. (Dkt. 112) at 16 (Undisputed Facts Nos. 20, 21, and 22); Defs.' Resp. (Dkt. 117) at 9 (stating in response to Plaintiff's Facts Nos. 20, 21, and 22 that "[t]he document speaks for itself").

[43] Convertible Promissory Note (Dkt. 112-3) § 3.2, at 2.

[44] *See id.* § 4, at 2.

[45] *See id.* § 5, at 2.

[46] *See id.* § 6, at 2–3.

of Oklahoma law.[47] The Note was executed by Avi, in both his individual capacity and his capacity as President of E & E Capital, Inc.[48]

The one-page Security Agreement executed in conjunction with the Loan Agreement and the Convertible Promissory Note memorialized the collateralization of Avi's membership Units in LTB:

> AVRAHAM SHE[M]UELIAN . . . (hereinafter called "grantor") hereby grants to Massoud Saghian . . . (hereinafter called "secured party") effective as of September 1, 2006, a security interest in the following property (hereinafter called the "collateral"):
>
> a.      All grantor's Units of ownership in Lawyers Title Building, L.L.C., an Oklahoma limited liability company, whether now owned or hereafter acquired, and all proceeds, products, profits, income, additions to, replacements and accessions thereof,
>
> to secure the payment and performance of the indebtedness and obligations set forth as follows (hereinafter called the obligations):
>
> (i)      That certain Convertible Promissory Note dated September 1, 2006 in the principal amount of $375,000.00, wherein Avraham She[m]uelian and E & E Capital, Inc., a California corporation, are the Borrowers and Massoud Saghian is the Lender.
>
> (ii)      The security interest herein created shall also secure the payment of all future loans and advances made by the secured party to Avraham She[m]uelian.[49]

---

[47] *See id.* §§ 7–9, at 3.

[48] *Id.* at 3.

[49] Security Agreement (Dkt. 112-4) at 1; Pl.'s Mot. Summ. J. (Dkt. 112) at 16 (Undisputed Fact No. 18); Defs.' Resp. (Dkt. 117) at 9 (stating that Plaintiff's Fact No. 18 is "[u]ndisputed" and arguing that this shows the membership units were "collateral to secure the repayment of a loan," thereby "prov[ing] Defendants' points" that Nissan gave him a loan and did not make a capital contribution).

A default under the Security Agreement was defined as "[d]efault in the payment or performance of any of the obligations or default under any agreement evidencing any of the obligations between Avraham She[m]uelian and secured party."[50] In the event of default, the remedy was that "the secured party may declare all of the obligations immediately due and payable and shall be entitled to exercise all of the rights and remedies of a secured party under the Uniform Commercial Code."[51] The Security Agreement also permitted Nissan to recover attorney fees upon "enforcing any right or exercising any remedy hereunder upon default of the borrower."[52] The Security Agreement was executed by Avi, in his individual capacity, and Nissan.[53]

Thereafter, it appears efforts to renovate the buildings and to make the project profitable continued, at least until Mr. Weingarten made allegations that Avi "ha[d] usurped and exercised exclusive control of Stryker Building, in breach of the Company's operating agreement, and has engaged in mismanagement, abuse of authority and misappropriation of [several joint venture] Companies' cash," and decided to sue Avi in state court on January 30, 2014, for dissolution of LTB and entities associated other joint

---

[50] Security Agreement (Dkt. 112-4) at 1; Pl.'s Mot. Summ. J. (Dkt. 112) at 17 (Undisputed Fact No. 26); Defs.' Resp. (Dkt. 117) at 9–10 (not disputing Plaintiff's Fact No. 26, but instead arguing the wording of the Security Agreement supports the idea that this was a loan and not a type of sale of membership Units).

[51] Security Agreement (Dkt. 112-4) at 1.

[52] *Id.*

[53] *Id.*

ventures.[54] On February 26, 2014, Avi and Parvaneh filed an application for appointment of a receiver to take over the operation of LTB and to sell the properties, which Mr. Weingarten joined.[55] The state court granted on March 14, 2014.[56] The Order Appointing Receiver (Dkt. 112-12) appointed a receiver "over the Companies and the Properties" and directed him "immediately [to] take possession and control of each of the Companies, the bank accounts of the Companies, and the Properties and [to] manage, operate, preserve and maintain the Companies and the Properties pending further order of this Court."[57]

At some undefined point in time prior to June 26, 2015, Nissan made demand on Avi, E & E Capital, Inc., and LTB for an assignment of 50% of the outstanding membership Units in LTB pursuant to the express language of the Loan Agreement and the Convertible

---

[54] Pet. ¶¶ 33–35, at 9, *Weingarten v. Shemuelian*, No. CJ-2014-0578 (Okla. Dist. Ct., Okla. Cty. filed Jan. 30, 2014). The truth of these allegations is not material to the motion at hand, but provides further context for other material facts.

[55] Order Appointing Receiver (Dkt. 112-12) at 1.

[56] *Id.*

[57] *Id.* ¶¶ 1–2, at 1–2; *see also* Pl.'s Mot. Summ. J. (Dkt. 112) at 18 (Undisputed Fact No. 28); Defs.' Resp. (Dkt. 117) at 10 (attempting to dispute the fact by drawing a distinction between appointment over the company versus appointment to take control of certain property, but without citation and seemingly in contradiction of the plain language of the Order Appointing Receiver).

Promissory Note.[58] Defendants failed or otherwise refused to deliver the membership Units to Nissan.[59]

On June 26, 2015, Nissan filed this lawsuit against Avi, E & E Capital, Inc., and LTB, alleging that the Loan Agreement and Convertible Promissory Note were breached when a receiver was appointed in Mr. Weingarten's state court action.[60] Plaintiff's Complaint (Dkt. 1) seeks foreclosure upon the secured membership Units and a declaratory judgment ordering conversion completed and affirming his ownership of the Membership Units, along with costs and attorney fees under the relevant provisions of the Loan Agreement and the Convertible Promissory Note.[61]

Since the filing of this lawsuit, Mr. Weingarten's state court lawsuit has resolved. Mr. Weingarten eventually obtained a judgment against Avi for $2,072,369.00, Avi satisfied that judgment on August 31, 2018, and Mr. Weingarten transferred all his

---

[58] Pl.'s Compl. (Dkt. 1) ¶ 23, at 5; Am. Answer & Counterclaims of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 21) ¶ 23, at 4 ("Defendants admit the allegations in paragraph 23 of Plaintiff's Complaint."); Pl.'s Mot. Summ. J. (Dkt. 112) at 17 (Undisputed Fact No. 27). *But see* Defs.' Resp. (Dkt. 117) at 10 (responding to Plaintiff's Fact No. 27 by arguing that "Plaintiff cannot rely on his pleadings to prove a fact" and that all money loaned has been repaid, thereby obviating the need for a demand).

[59] Pl.'s Compl. (Dkt. 1) ¶ 23, at 5; Am. Answer & Counterclaims of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 21) ¶ 23, at 4 ("Defendants admit the allegations in paragraph 23 of Plaintiff's Complaint."); Pl.'s Mot. Summ. J. (Dkt. 112) at 17 (Undisputed Fact No. 27). *But see* Defs.' Resp. (Dkt. 117) at 10 (responding to Plaintiff's Fact No. 27 by arguing that "Plaintiff cannot rely on his pleadings to prove a fact" and that all money loaned has been repaid, such that Plaintiff is not entitled to further compensation in the form of "all of the Defendants' interest in the building").

[60] Pl.'s Compl. (Dkt. 1) ¶ 25, at 5.

[61] *Id.* ¶¶ 27–28, at 6.

membership Units in LTB to Avi.[62] It appears, however, that Avi subsequently assigned Mr. Weingarten's membership Units to Parvaneh on May 15, 2019, such that she now has 50% ownership of LTB.[63]

The parties also became embroiled in a foreclosure action involving the real property. On August 11, 2017, RCB Bank filed a foreclosure action based on a mortgage filed in December 2010 and a mortgage modification filed in March 2013.[64] As a result of that litigation, another receiver was appointed to manage the properties.[65] The Court takes judicial notice of the fact that the Church was sold August 7, 2018, for $600,000.00 and that the Stryker Building and adjacent parking lot were sold on April 11, 2019, for $2,200,000.00.[66] The proceeds of those sales were first used to satisfy the judgment RCB

---

[62] Shemuelian's Emergency Mot. to Stay Proceedings to Enforce J. (Dkt. 112-13) ¶¶ 2, 4–5, at 1–2; E-mail from Richard L. Rose, Mahaffey & Gore, P.C., to Dakota Low, Law Office of Dakota C. Low, PLLC, (Dkt. 112-13) at 5 (Sept. 4, 2018); Assignment (Stryker Building, L.L.C., f/k/a Lawyer's Title Building, L.L.C.) (Dkt. 112-13) ¶ 1, at 29.

[63] Magic Invs.'s Mot. for Distribution of a Portion of Sales Proceeds Related to Stryker Bldg., LLC f/k/a Lawyer's Title Bldg., LLC ¶ 1, at 1, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed June 25, 2019).

[64] Verified Pet. & Appl. for Appointment of Receiver ¶¶ 12, 19, at 3–4, 6, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed Aug. 11, 2017).

[65] Order Appointing Receiver at 1–2, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed Aug. 22, 2017).

[66] *See* Report of Receiver from Aug. 1, 2018 through Aug. 31, 2018 at 5, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed Sept. 14, 2018); Final Report of Receiver from Mar. 1, 2019 Through May 10, 2019 at 3, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed May 10, 2019).

Bank obtained against Avi and LTB,[67] but some remainder is being held by the Oklahoma County Court Clerk.[68]

## *Analysis*

Nissan has filed a Motion for Summary Judgment (Dkt. 112) arguing that the undisputed facts establish that Avi and E & E Capital, Inc. defaulted on the Convertible Promissory Note; that LTB, Avi, and E & E Capital, Inc. breached the terms of the Loan Agreement; and that he is therefore entitle to judgment as a matter of law. Nissan seeks relief in the form of foreclosure on the secured membership Units in LTB, specific performance under the Convertible Promissory Note that converts to equity in LTB, contractual costs and attorney fees, and post-judgment interest on the costs and attorney fees.

Nissan's claim for default on the Convertible Promissory Note and the Loan Agreement is essentially a breach-of-contract claim.[69] A breach of contract claim requires three elements: (1) formation of a contract, (2) breach of the contract, and (3) damages as

---

[67] *See, e.g.*, Journal Entry of J. ¶¶ A–C, at 5, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. Mar. 21, 2018), *aff'd*, *RCB Bank v. Stryker Bldg., LLC*, No. 116,931, slip op. ¶¶ 1, 18, at 2, 10 (Okla. Civ. App. Aug. 30, 2018); Release & Satisfaction of J. at 1, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed Aug. 26, 2019).

[68] Journal Entry at 3, *RCB Bank v. Stryker Bldg., LLC*, No. CJ-2017-4581 (Okla. Dist. Ct., Okla. Cty. filed Nov. 15, 2019).

[69] *Wells Fargo Bank, N.A. v. Heath*, 2012 OK 54, ¶ 12, 280 P.3d 328, 334 ("A promissory note is a negotiable instrument and a negotiable instrument is a contract." (citing Okla. Stat. tit. 12A, § 3–104 (2001); Fred H. Miller & Alvin C. Harrell, *The Law of Modern Payment Systems and Notes* § 1.03 (practitioner's ed. 2002))).

a direct result of the breach.[70] When several contracts relate to the same matter between the same parties and are made as parts of substantially one transaction, they are to be read together as a single agreement.[71]

Regarding formation, Nissan asserts that the parties contemporaneously executed the Convertible Promissory Note, Loan Agreement, and Security Agreement in each other's presence; and Defendants do not dispute those facts.[72] Nevertheless, Defendants attack the formation of the contracts insofar as they argue that "[t]he consideration for Borrower's promise has failed" because Nissan allegedly did not advance the full amount of $375,000.00.[73] The dispute over the material fact about the amount of Nissan's contribution, however, is not a genuine dispute for two reasons.

First, Defendants have already made a judicial admission of the fact that Nissan loaned them $375,000. Nissan's Motion for Summary Judgment (Dkt. 112) asserts that he

---

[70] *Cates v. Integris Health, Inc.*, 2018 OK 9, ¶ 11, 412 P.3d 98, 103 (citing *Dig. Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843).

[71] Okla. Stat. tit. 15, § 158 (2001); *Rennie v. Okla. Farm Mortg. Co.*, 1924 OK 568, ¶¶ 7–8, 10, 226 P. 314, 315 (discussing how a note and a mortgage given to secure payment under the note may be construed as one contract (quoting *Okla. City Dev. Co. v. Picard*, 1915 OK 61, ¶ 0, 146 P. 31, 31, *overruled in part on other grounds by Ohio Nat'l Life Ins. Co. v. Dobbs*, 1929 OK 368, 282 P. 306); *First Nat'l Bank of Sturgis v. Peck*, 8 Kan. 660, 663 (1871); 1 Leonard A. Jones, *A Treatise on the Law of Mortgages of Real Property* § 71, at 80 (Bobbs-Merrill Co., 7th ed., 1915); 27 Cyclopedia of Law and Procedure 1135 (William Mack ed., 1907); 3 *Ruling Case Law* § 54, at 870 (William M. McKinney & Burdett A. Rich eds., 1914))).

[72] Pl.'s Mot. Summ. J. (Dkt. 112) at 13 (Undisputed Fact No. 8); Defs.' Resp. (Dkt. 117) at 8 (stating that Plaintiff's Fact No. 8 is "[u]ndisputed").

[73] Defs.' Resp. (Dkt. 117) at 15.

delivered $375,000 to Avi.[74] In support, Nissan cites an admission made by Avi and E & E Capital, Inc. in their Answer (Dkt. 7) to Plaintiff's Complaint (Dkt. 1) stating, "Defendants admit that Plaintiff loaned E&E Capital the sum of $375,000 and that such proceeds were used in connection with the purchase of the real property owned by Stryker Building, LLC. Defendants further state that over $300,000 of the $375,000 initially loaned has been returned to Plaintiff."[75] This admission in a pleading is what may be called a "judicial admission." "Judicial admissions are formal admissions . . . which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."[76] The judicial admissions in Defendants' Answer (Dkt. 7) remain binding on them, meaning they cannot avoid the formation of an enforceable contract on the basis of lack of consideration.[77]

Second, Defendants' Response to Plaintiff's Motion for Summary Judgment (Dkt. 117) asserts that "the $375,000.00 was never loaned" and that "Plaintiff loaned Defendants

---

[74] Pl.'s Mot. Summ. J. (Dkt. 112) at 12 (Undisputed Fact No. 3); *see also id.* at 13 (Undisputed Facts Nos. 6 and 7, which mention the total contribution amount of $375,000).

[75] Answer of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 7) ¶ 13, at 2. An identical admission appears in their amended answer. Am. Answer of Defs. Shemuelian & E&E Capital, Inc. (Dkt. 21) ¶ 13, at 2.

[76] *Guidry v. Sheet Metal Workers Int'l Ass'n,* 10 F.3d 700, 716 (10th Cir. 1993) (internal quotation marks omitted).

[77] *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736, 739 (10th Cir. 2013) ("[A]dmissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." (internal quotation marks omitted) (quoting *Missouri Housing Dev. Comm'n v. Brice,* 919 F.2d 1306, 1314 (8th Cir. 1990))).

only $302,255.00."[78] In support, Defendants cite Nissan's deposition testimony, where he could only identify five money transfers totaling $302,255. As Nissan points out in the Final Pretrial Report (Dkt. 137), this appears to be a completely new argument.[79] Moreover, review of the Nissan's deposition testimony demonstrates there were likely more money transfers, but Nissan simply failed to retain all the receipts evidencing that.[80]

---

[78] Defs.' Resp. (Dkt. 117) at 8, 10–11 (Response to Plaintiff's Fact No. 7 and Defendants' Undisputed Fact No. 1); *see also id.* at 7 (Response to Plaintiff's Facts Nos. 3 and 6).

[79] Final Pretrial Report (Dkt. 137) at 3–4 ("Defendant's asserted defense of Plaintiff's failure to fund the entire $375,000 is a new defense not previously asserted in their Answer and contrary to their admissions in their Answer . . . .").

[80] Massoud Saghian Dep. (Dkt. 117-2) at 3–4, 67:20–68:2, 73:3–:25

> **Q.    [By Defendant's former counsel, Mark McPhail] Okay. I'm going back to the question I asked previously, which is: Do you have any documentation of transfers that you made to Avi prior to the $119,000 transfer that was made on August 30th of 2006?**
>
> THE INTERPRETER [Ori Kritz, Ph.D.]: No. He doesn't have any more documents other than what he already submitted.
>
> . . . .
>
> **Q.    And we went through four different exchange receipts.**
>
> A.    Yes.
>
> **Q.    And I added those amounts up and came up with $183,255. Does that sound right to you?**
>
> A.    Yes, if that's what the receipts say.
>
> MR. KUTTAB [Plaintiff's non-resident attorney]: "If this is the receipts that I had say."
>
> THE INTERPRETER: Yes. But because -- he said that there were receipts that he didn't send you because he didn't have them anymore.
>
> **Q.    (By Mr. McPhail) Did you make any efforts to retrieve other receipts?**
>
> A.    Okay. Basically, there are receipts that he gave a few years ago already and this is only what was left in his computer . . . .

Thus, it is disingenuous for Defendant to rely on that deposition testimony as evidence that Nissan never transferred the full $375,000.

Regarding breach, Nissan first asserts that Defendants defaulted under § 3.1.1 of the Convertible Promissory Note and § 7.1 of the Loan Agreement when, upon demand for payment, they refused to convert the indebtedness to equity equal to 50% of the total outstanding Units of LTB, as required by §§ 1, 2, and 10 of the Convertible Promissory Note and by §§ 1.1, 2.1, and 2.2 of the Loan Agreement. The parties do not dispute that Nissan made demand upon Avi for payment or that Avi refused, or otherwise failed, to convert the indebtedness into company equity.[81] What Defendants do dispute, however, is whether the contractual provisions actually required payment by conversion and whether they discharged their debt by payment in full, either of which would require denial of summary judgment in Nissan's favor. Defendants even suggest that their alternative reading of the payment provisions renders the contracts ambiguous, such that a trial is necessary to ascertain the parties' true intent.

An agreement is only considered ambiguous if it is susceptible to different interpretations; but courts should refrain from creating an ambiguity by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on [a] provision."[82] "[W]here a contract . . . is plain and unambiguous, and there is no uncertainty therein, the intent of the parties is to be determined by the language of the written

---

[81] *See supra* notes 36, 42, 56–57 and accompanying text.

[82] *Osprey L.L.C. v. Kelly-Moore Paint Co., Inc.*, 1999 OK 50, ¶ 14, 984 P.2d 194, 199.

instrument alone."[83] "Words 'must be viewed in the context of the contract and must be given [their] plain ordinary meaning.'"[84] Only when the contractual document is unclear or inconsistent may courts utilize extrinsic evidence to ascertain intent.[85]

Defendants' arguments of ambiguity and of an alternative contractual interpretation are unavailing. Defendants suggest an ambiguity exists because "Plaintiff variously characterize[s] the parties' agreement, at times, as a loan, and at other times, [as] a capital contribution."[86] Invoking § 2.1 of the Loan Agreement and § 1 of the Convertible Promissory Note, Defendants posit that the documents evidence a loan, that the contractual terms contemplated a money payment of the "unpaid principal balance," that equity in LTB was therefore only a pledge of collateral, and that conversion of the indebtedness to company equity could only occur after default for failure to make a money payment.[87] But Defendants' construction appears to be a "strained construction" that takes various

---

[83] *Johnson v. Butler*, 1952 OK 207, ¶ 6, 245 P.2d 720, 722 (quoting *Cont'l Cas. Co. v. Wear*, 1939 OK 254, ¶ 0, 91 P.2d 91, 91; citing *Vanzant v. State Ins. Fund*, 1950 OK 237, 223 P.2d 111; *Terrill v. Laney*, 1948 OK 109, 193 P.2d 296; *Bayouth v. Howard*, 1948 OK 34, 190 P.2d 783; *Jennings v. Amerada Petroleum Corp.*, 1937 OK 228, 66 P.2d 1069); *see also Logan Cty. Conservation Dist. v. Pleasant Oaks Homeowners Ass'n*, 2016 OK 65, ¶ 15, 374 P.3d 755, 762; *Beattie v. State ex rel. Grand River Dam Auth.*, 2002 OK 3, ¶ 12, 41 P.3d 377, 382 (citing *Messner v. Moorehead*, 1990 OK 17, 787 P.2d 1270).

[84] *Logan Cty. Conservation Dist.*, 2016 OK 65, ¶ 15, 374 P.3d at 762 (alteration in original) (quoting *Lucas v. Bishop*, 1998 OK 16, ¶ 11, 956 P.2d 871, 874); *see also* Okla. Stat. tit. 15, § 160 (2001) ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.").

[85] *Id.* (citing *Beattie*, 2002 OK 3, ¶ 12, 41 P.3d at 382).

[86] Defs.' Resp. to Pl.'s Mot. Summ. J. (Dkt. 117) at 7.

[87] *See id.* at 5–6, 13.

provisions out of context. For example, Defendants alternately omit inconvenient contractual language from quoted provisions and liberally paraphrase other provisions with favorable embellishments of the relevant language:

> What the documents actually provide is that the Plaintiff ("Lender") promised to loan Defendants "the Borrowers" $375,000.00 and "Borrowers' hereby promise to pay to the order of . . . 'Lender' . . . the principal sum of Three Hundred Seventy-five Thousand Dollars ($375,000.00), . . ."
>
> . . . .
>
> In Section 1 of the Promissory Note Avraham Shemuelian and E&E Capital, Inc. (collectively "the Borrowers"), promised to pay Plaintiff "the Lender" "the principal sum of $375,000.00" thirty (30) days after demand. Section 2 provides that after demand *(which is not complied with)* the "Lender" would be entitled to 50% of the units of ownership.[88]

The ellipsis at the end of the first quoted paragraph strategically omits language at the end of the provision that qualifies the preceding language:

> Avraham She[m]uelian, an individual, and E & E Capital, Inc., a California corporation (collectively, the "Borrowers") hereby promise to pay to the order of Massoud Saghian, an individual, . . . (the "Lender") . . . the principal sum of THREE HUNDRED SEVERTY FIVE THOUSAND DOLLARS ($375,000.00), without interest thereon, thirty (30) days after demand therefore (the "Maturity Date"), *payable, in full, as follows*.[89]

The omitted phrase "payable . . . as follows" points us to §§ 2 and 10 of the Convertible Promissory Note, both of which unambiguously contradict the notion that payment with money is all Nissan can demand initially and that payment by conversion into company equity is only an option upon default:

---

[88] Defs.' Resp. to Pl.'s Mot. Summ. J. (Dkt. 117) at 5–6 (emphasis added).

[89] *See supra* note 39 and accompanying text (emphasis added).

> **SECTION 2.  Payment Upon Demand.**  Upon demand, *Borrowers shall take such steps as may be necessary to cause this Note to be converted into such number of Units of Lawyers Title Building, L.L.C.*, . . . such that after the conversion the Lender [i.e., Nissan] shall be the owner and holder of fifty percent (50% of the outstanding Units of the Company. This note shall otherwise be non-recourse as to any cash sums due hereunder.
>
> . . . .
>
> **SECTION 10.  Conversion into Equity Interest.**  It is the intention of the parties hereunder that *this Note may only be repaid by conversion of the indebtedness due hereunder to fifty percent (50%) of the then total outstanding Units of the Company.*[90]

Moreover, Defendants' paraphrase of § 2 adds the explanatory parenthetical "(which is not complied with)" that is nowhere to be found in the text of the provision and that would materially alter the meaning of the provision. Although an objective review of §§ 2 and 10 reveals that these provisions may arguably be at odds with respect to whether Nissan must demand payment alone or both payment and conversion, these provisions stand in unison against Defendants' description of the nature of the contracts. The overall lack of ambiguity becomes even clearer when the relevant provisions of the Loan Agreement are taken into consideration:

> 1.1  Loan.  . . . The unpaid principal balance of funds advanced under the Convertible Promissory Note (as hereafter defined) will be due and payable on demand *in accordance with the terms and conditions hereof* [i.e., § 2 of the Loan Agreement] (the "Loan Maturity Date").
>
> . . . .
>
> 2.1  Convertible Promissory Note.  . . . The entire unpaid principal balance shall be due and payable on the Loan Maturity Date *by conversion into Units of the Company* [i.e., LTB] *as provided therein* [i.e., in the Convertible Promissory Note]."

---

[90] *See supra* note 39–40 and accompanying text (emphasis added).

2.2 <u>Convertible Promissory Note Payment</u>. The Convertible Promissory Note shall be a Convertible Promissory Note *providing for the conversion of the Note, in full upon demand*, into such number of Units of the Company [i.e., LTB] such that after the conversion, Lender [i.e., Nissan] shall be the owner and holder of fifty percent (50%) of the outstanding Units of the Company.[91]

All of these provisions demonstrate a clear intent to permit Nissan the option to require payment in the form of converted equity in LTB.

Defendants also attack as "absurd" Nissan's construction of the contractual provisions as a capital contribution, questioning why the parties would choose to evidence a capital contribution through a promissory note payable "on demand" instead of through a bill of sale and suggesting that it would be ridiculous for Defendants to give Nissan every membership Unit they own in LTB.[92] But:

[I]t should go without saying that the text of a statute cannot simultaneously be ambiguous and absurd. An ambiguous statute, after all, is one that is susceptible to more than one *reasonable* meaning. If a statute can be read one way that is quite reasonable, but another way that is quite absurd, then by definition it is not ambiguous. That is why the absurdity canon "should not be confused with a useful technique for resolving ambiguities in statutory language" because it "properly 'applies to *unambiguous* statutes.'"[93]

Even when applicable, "[t]he absurdity doctrine applies 'in only the most extreme of circumstances,' when an interpretation of a [contract] 'leads to results so gross as to shock

---

[91] *See supra* notes 30–31 and accompanying text (emphasis added).

[92] Defs.' Resp. to Pl.'s Mot. Summ. J. (Dkt. 117) at 5–7, 9, 12.

[93] *McIntosh v.* Watkins, 2019 OK 6, ¶ 11, 441 P.3d 1094, (Wyrick, V.C.J., dissenting) (quoting *In re Taylor*, 899 F.3d 1126, 1131 n.2 (10th Cir. 2018); citing *Odom v. Penske Truck Leasing Co.*, 2018 OK 23, ¶ 18, 415 P.3d 521, 528; *YDF, Inc. v. Schlumar, Inc.*, 2006 OK 32, ¶ 6, 136 P.3d 656, 658; *In re J.L.M.*, 2005 OK 15, ¶ 5, 109 P.3d 336, 338; ).

the general moral or common sense,' which is a 'formidable hurdle' to the application of this doctrine."[94] The doctrine "seeks to serve a 'linguistic rather than substantive' function, and does not depend nearly as much on doubtful claims about legislative intentions . . . . Instead, it aims only to enforce a meaning reasonable parties would have thought plain all along."[95] Here, the absurdity urged by Defendants is not readily apparent to the Court. Instead, it seems Nissan could not buy company equity outright because of the state constitutional provision that prevents him from owning real estate in Oklahoma.[96] Thus, when Nissan became discontented with Avi's management of the company, the two hammered out a solution that would give Avi another shot to prove trustworthy, that would permit the possibility of future funding from Nissan, but that would also give Nissan more power to commandeer the project and obtain a return on his investment if the situation digressed yet again. The contracts should not be rendered absurd just because their provisions might seem rather one-sided. Furthermore, Defendants' attempts to disavow characterizations of this transaction as a capital contribution are disingenuous, particularly because Defendants admit that Nissan has always been entitled to at 25% share of equity and to the attendant distributions related to either rental income or sale of the properties.[97] If this was a pure loan, Nissan would have no right to distributions.

---

[94] *In re Taylor*, 737 F.3d 670, 681 (10th Cir. 2013) (citations omitted).

[95] *Id.*

[96] *See supra* notes 14, 16–17 and accompanying text.

[97] *See supra* note 18 and accompanying text; *see also* Defs.' Resp. to Pl.'s Mot. Summ. J. (Dkt. 117) at 6 (acknowledging that "E&E Capital, Inc. holds 25% of the units in trust for Plaintiff" and that "Plaintiff is entitled to" that share of the company).

Consequently, Defendants have failed to demonstrate why the payment provisions of the Convertible Promissory Note and the Loan Agreement—having been accorded their plain meaning—have not been breached.

But Defendants also argue that they have fully performed under the provisions at issue insofar as they have paid $303,000.00 to Nissan,[98] such that the element of breach cannot be proved and summary judgment should be denied. The success of this argument, of course, is contingent upon a finding that Nissan only loaned Defendants $302,255.00, such that repayment of $303,000.00 covers the full amount of the loan. But for the reasons already discussed, Defendants have not genuinely disputed the fact that Nissan delivered $375,000.00 to Defendants.[99] Thus, Defendants' averment that they have repaid only $303,000.00 is of no avail. Partial payment does not terminate the Defendants' obligation under the Convertible Promissory Note, nor would it give Defendants a right to reduction or set-off.[100] Partial payment is just as much a default (breach) as no payment at all.

---

[98] Defendants fail to acknowledge the possibility that their payments of $303,000.00 may be construed as distributions based on company earnings, rather than loan payments. There is no evidence before the Court to this effect, but the categorization of these payments in the light most favorable to Defendants does not preclude entry of summary judgment against them.

Nissan also argues that all these payments were received prior to execution of the loan documents. But again, there is no evidence before the Court in support of such arguments, and such fact is not material to the issues raised on summary judgment.

[99] *See supra* notes 72–79 and accompanying text.

[100] *See supra* note 44 and accompanying text (stating under § 4 of the Convertible Promissory Note that "[t]he obligations of the Borrowers under this Note shall not be subject to reduction . . . [or] set-off," among other defenses).

Regarding breach, Nissan also asserts that Defendants defaulted under § 3.1.4 of the Convertible Promissory Note and § 7.4 of the Loan Agreement when a receiver was appointed to control LTB. Defendants respond by arguing that the text of these provisions does not cover the situation at hand because "Lawyer's Title Building, LLC was not put into a receivership" and because "[a] receiver was appointed over certain property owned by Lawyer's Title Building, LLC and not over the company itself."[101] Defendants also dismiss this allegation of default on the basis that full repayment occurred "<u>long</u> before any property owned by Lawyer's Title Building, LLC was placed in receivership."[102] Section 3.1.4 of the Note provides that "[t]he (a) institution of bankruptcy, reorganization, liquidation or receivership proceedings by or against either the Borrowers or the Company, or (b) the making of any assignment for the benefit of creditors by or against either the Borrowers or the Company, or (c) if either the Borrowers or the Company becomes insolvent, or (d) any admission by either the Borrowers or the Company of its inability to pay its debts as such debts mature" shall constitute a default under the Note.[103] Section 7.4 of the Loan Agreement contains identical language in defining a default under the Loan Agreement.[104] Thus, the plain language of the provisions requires only "[t]he institution of . . . liquidation or receivership proceedings by or against" Avi, E & E Capital, Inc., or LTB.

---

[101] Defs.' Resp. to Pl.'s Mot. Summ. J. (Dkt. 117) at 13–14.

[102] *Id.* at 13.

[103] Convertible Promissory Note (Dkt. 112-3) § 3.1.4, at 2; *see also supra* notes 36, 42 and accompanying text.

[104] Loan Agreement (Dkt. 112-4) § 7.4, at 4; *see also supra* note 36 and accompanying text.

Here, it appears both liquidation and receivership proceedings were instituted against LTB when Mr. Weingarten filed his state court action requesting dissolution of LTB and other entities. While that action was pending, all members of LTB requested the appointment of a receiver to manage the property while the state court considered whether to dissolve LTB and liquidate its assets pursuant to sections 2037 through 2040 of the Oklahoma Limited Liability Company Act, Okla. Stat. tit. 18, §§ 2037–2040.[105] The Order Appointing Receiver (Dkt. 112-12) appointed a receiver "over the Companies and the Properties" and directed the receiver "immediately [to] take possession and control of each of the Companies, the bank accounts of the Companies, and the Properties and [to] manage, operate, preserve and maintain the Companies and the Properties pending further order of this Court."[106] This language directly contradicts Defendant's arguments that a receiver was appointed over LTB's property and not over LTB itself. Ultimately, the state court never dissolved the company or liquidated the assets as part of Mr. Weingarten's lawsuit due to the settlement he reached with Avi, whereby he transferred all his membership Units in LTB to Avi.[107] Nevertheless, that does not change the indisputable fact that an event of default occurred when receivership proceedings were instituted. Furthermore, for all the reasons previously discussed about Defendant's failure to genuinely dispute default on the basis of nonpayment,[108] Defendant's argument that the loan was repaid in full prior to these

---

[105] *See supra* notes 54–55 and accompanying text.

[106] *See supra* note 57 and accompanying text.

[107] *See supra* note 62 and accompanying text.

[108] *See supra* notes 72–79, 99 and accompanying text.

receivership proceedings fails. Consequently, the undisputed facts demonstrate default, or breach, of the Convertible Promissory Note and the Loan Agreement on two counts.

Regarding damages as a direct result of breach, the Court has already determined that there is no genuine dispute over the material fact of nonpayment. Furthermore, the Court has already determined that, under the terms of the Convertible Promissory Note and Loan Agreement, Nissan was entitled to demand and has demanded conversion of Defendants' indebtedness into a 50% share in the equity of LTB. Such payment is due and owing, and Nissan is damaged until he receives such payment. Moreover, because LTB no longer owns the real estate, Nissan's ownership of LTB will not run afoul of the Oklahoma Constitution.

Having demonstrated that there are no genuine disputes over the material facts establishing the elements of his breach-of-contract claim, Nissan is entitled to judgment as a matter of law on that claim.

To prevail on his foreclosure claim, Nissan need only establish (1) the existence of a valid security agreement, and (2) a default under the terms of that agreement.[109] Nissan has demonstrated the existence of a valid security agreement in the evidence attached to his Motion for Summary Judgment (Dkt. 112), and Defendants have failed to dispute the authenticity of the attached Security Agreement (Dkt. 112-5). Regarding default, the Court has already explained how nonpayment and the institution of receivership proceedings against LTB both constituted defaults under the Convertible Promissory Note and the Loan

---

[109] *See U.S. Bank, N.A. ex rel. Credit Suisse First Boston Heat 2005–4 v. Alexander,* 2012 OK 43, ¶ 9, 280 P.3d 936, 938.

Agreement. By the terms of the Security Agreement, these also serve as bases for default under the Security Agreement. Thus, Nissan has established both elements of his foreclosure claim and is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Plaintiff Massoud Saghian's Motion for Summary Judgment (Dkt. 112) is hereby **GRANTED**. Plaintiff's Convertible Promissory Note, Loan Agreement, and Security Agreement are in default and the property described in the Security Agreement should be foreclosed.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Plaintiff have a judgment of foreclosure for Defendant E & E Capital, Inc.'s 200 membership Units in Stryker Building, L.L.C. f/k/a Lawyer's Title Building, L.L.C., an Oklahoma limited liability company (or whatever other amount of membership Units would render Plaintiff the owner and holder of 50% of all outstanding membership Units). In keeping with the terms of the Convertible Promissory Note, Defendants "shall take such steps as may be necessary" to effect this foreclosure and transfer of ownership. Pursuant to the terms of the Security Agreement (Dkt. 112-5) and Section 6 of the Convertible Promissory Note (Dkt. 112-3), Plaintiff is also awarded costs and reasonable attorneys' fees incurred in collecting under the Note or in exercising his remedy under the Security Agreement, as determined hereafter pursuant to Plaintiff's filing of a Bill of Costs and a motion for attorney fees.

**IT IS SO ORDERED this 19th day of March, 2020.**

_____

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE